## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

IN RE:  DAVID L. SEAY, Debtor                                4:05-bk-19608E
                                                             CHAPTER 7


DAVID L. SEAY                                                PLAINTIFF

VS.                             AP NO.: 4:05-ap-01300

UNITED STATES OF AMERICA,
INTERNAL REVENUE SERVICE                                     DEFENDANT


### MEMORANDUM OPINION

### OVERVIEW

In a Complaint filed November 8, 2005, Debtor and Plaintiff David L. Seay ("**Plaintiff**") challenges the Internal Revenue Service's ("**IRS**") assessment of unpaid individual income taxes and interest for Plaintiff's 1982 tax-year (the "**1982 assessment**"). Plaintiff further requests a return of tax refunds in the amount of $6,928 retained by the IRS as a result of the 1982 assessment, and an award of attorneys' fees.  The IRS filed its amended proof of claim for $358,627.27 in unpaid tax and prepetition interest resulting from the 1982 assessment on January 6, 2006.  **However, the parties agree that even if the 1982 assessment is valid, it is dischargeable in Plaintiff's bankruptcy.** (See Complaint ¶ 35-37; Answer ¶ 35-37.)   Accordingly, the Court must determine whether the 1982 assessment is valid, and therefore, whether the Plaintiff is entitled to a refund of tax refunds he would have

otherwise been entitled to receive, but were instead applied toward the 1982 assessment.

Both parties agree that the 1982 assessment resulted from the IRS's disallowance of loss deductions claimed by Seay as a limited partner in a partnership known as Caxton Oil Technology Partners ("**Caxton**").  The IRS asserts that the 1982 assessment is valid and was not effected by a 1995 tax-year assessment (the "**1995 assessment**") even though the 1995 assessment was admittedly based on the validity of the 1982 loss.  Plaintiff asserts that the 1995 assessment was in fact a settlement of the audited loss deduction taken in 1982, either by express or implied agreement, or alternatively as a matter of law, and that in any event, the IRS should be estopped from assessing a 1982 tax liability based on the <u>invalidity</u> of the 1982 loss deduction after assessing a 1995 tax liability based on the <u>validity</u> of the 1982 loss deduction.  The Court agrees with Plaintiff and finds that the 1982 assessment is invalid on the basis of equitable estoppel, that Plaintiff is entitled to a return of all refunds retained by the IRS and applied to the 1982 tax liability with interest, and that Plaintiff is entitled to attorney fees to the extent allowed by law.

## FACTS

In 1982, the Plaintiff invested $18,750 in Caxton, a limited partnership.  As a result of the losses generated by Caxton, the Plaintiff took a deduction in the amount of $74,336 on his 1982 individual income tax return.  That year was the first year the Plaintiff filed jointly with his spouse Claudia.[1]  The Plaintiff only deducted Caxton losses in 1982, the first

---

[1]Plaintiff's wife Claudia Seay was deemed to be an  innocent spouse by the IRS with respect to the federal income tax liability created by the denial of the  loss claimed for 1982;

2

year of his investment, and did not deduct any other losses generated by the partnership in subsequent years.

In late 1984, Caxton was audited by the IRS under the newly enacted Tax Equity and Fiscal Responsibility Act of 1982 ("**TEFRA**"). TEFRA established a single unified procedure for determining the tax treatment of all partnership items at the partnership level, rather than separately at the partner level. The IRS denied the losses generated by Caxton, and Tax Court litigation ensued, resulting in consolidation with other similar partnerships and agreed test cases (the "**Tax Court Litigation**"). The Tax Court Litigation was ultimately appealed to the U.S. Supreme Court, but the Supreme Court denied certiorari in January 1995. The Tax Court Litigation ultimately resulted in an assessment for Plaintiff's 1982 tax year, as described herein.

In 1995, the Caxton partnership terminated and filed its final partnership return. The IRS, being aware of the partnership's termination, audited the individual partners in 1997 to ensure that the partners included the proper amount of income in the year of partnership termination. Termination of a partnership requires a partner to include in income in the year of termination his or her "negative capital account" in the partnership. Losses generated by a partnership operate to decrease a partner's basis in the partnership, thus creating a negative capital account and a gain on the "deemed disposition" of that partnership interest upon the termination of the partnership. On behalf of the IRS, Revenue Agent Dave Wright prepared

---

unlike Plaintiff, Mrs. Seay's tax refunds have not been retained by the IRS and applied towards the 1982 assessment.

a Form 5346, Examination Information Report (the "**Examination Report**"), and sent it to

a revenue agent in the Little Rock office of the IRS, who examined (*i.e.*, audited) the

Plaintiff's 1995 individual income tax return.  As noted on the Examination Report, when

the Plaintiff's 1995 return was examined, the IRS had full knowledge that the 1982 losses

had been denied by the IRS during the course of the TEFRA examination and that the

litigation pertaining to the issues under examination had not yet been concluded.

Specifically, the Examination Report stated:

> The individual or entity identified above is an investor in at least one of several
> tax shelter partnerships promoted by Gary Krause.  The partnerships originated
> in 1980, 1981, 1982, and 1983.  The IRS disallowed the losses originating in
> 1981, 1982, and 1983.  The cases were consolidated for Tax Court and the
> court sustained the disallowance of the losses, R.A. Hildebrand and Dorthy A.
> Hildebrand Wahl, v. Commissioner of Internal Revenue, 99 T.C. 132.  The
> taxpayer's [sic] subsequently appealed to the U.S. Court of Appeals which also
> upheld the disallowance of the losses, R.A. Hildebrand and Dorthy A.
> Hildebrand Wahl, v. Commissioner, 94-2 USTC p. 50, 305.  The taxpayer's
> [sic] subsequently petitioned the Supreme Court which refused to overturn the
> decision on 1/9/95, Krause v. Comm. & Hildebrand v. Comm., S.CT cert.
> Denied, 115 S.CT 727.

> The partnerships continued to file returns & the subsequent years were not
> examined.  The shelters have since "burned out" and the partnerships filed
> final returns on the 1995 calendar year.  The majority of the investors
> continued to claim losses from the partnerships and many have large NOL's
> generated entirely from the tax shelters.  All partners have large negative
> capital accounts reflecting the use of large non-recourse notes to generate huge
> tax losses.  As the partnership filed final returns, the partners have disposed of
> their partnership interest and accordingly must recognize gain under Sections
> 741, 742, & 1011.  The partnerships used large non-recourse notes &
> therefore, the partners would all have a large negative basis in their partnership
> interest.

4

Wright testified that he expected the Plaintiff's 1995 tax to be determined by only using Caxton losses claimed for years **not** involved in the Tax Court litigation. That is, because the losses taken in years subject to the TEFRA proceeding had been challenged, those losses should not have been used to decrease the Plaintiff's capital account or basis in his partnership interest.[2] However, Plaintiff took a Caxton loss deduction **only** on his 1982 tax return; yet, it is undisputed that the IRS computed the 1995 tax liability by using the deduction claimed by the Plaintiff in 1982 to create a negative capital account, which, when offset against the Plaintiff's investment in Caxton, resulted in a capital gain liability to Plaintiff for 1995, when Caxton ceased operations.

On August 20, 1997, Plaintiff and Mrs. Seay received a notice from the IRS informing them that their 1995 tax return had been assigned to Revenue Agent Bill Laird for examination. After visiting his accountant, Plaintiff and Mrs. Seay hired Bob Hardin as counsel. Hardin had reviewed the Examination Report, which had instigated the 1995 audit, and had a personal meeting with Laird. Hardin testified that the Examination Report indicated to him that the tax liability arose from the Plaintiff's investment in Caxton and the 1982 loss he had taken. Hardin testified that while negotiating with Laird, he believed Laird had the authority to settle the disputes involving the 1982 Caxton loss. Hardin explained that he had read that the IRS was settling some of the disputes involving tax shelters in this

---

[2]Pursuant to 26 U.S.C. § 6225, the assessment of an individual partner's tax deficiency attributable to partnership items (such as the Caxton losses claimed by Plaintiff on his 1982 tax return) must await the outcome of the related partnership proceeding.

5

manner – that is, by taxing the investors on their negative capital accounts when the partnership terminated.

Laird, however, does not remember discussing the 1982 tax year, except to the extent the 1982 loss caused the capital gain in 1995. He testified that he did not understand what the litigation over the 1982 loss deduction meant, and that he did not understand the TEFRA rules or that he should not have used the 1982 loss in determining the 1995 tax due to the pending Tax Court Litigation. Laird stated that in hindsight, the Examination Report could have been more clear, but that he did not ask Wright for clarification at the time because he thought he understood what he was supposed to do, which was to assess capital gain tax in 1995 based on the taxpayer's negative capital account. Laird testified that he did not consider whether or not there might be a 1982 tax assessed in the future based on the 1982 loss deduction.

As a result of Hardin and Laird's negotiations, the Plaintiff, Mrs. Seay and the IRS executed a Consent to Assessment on November 21, 1997, whereby Plaintiff agreed to pay the increased tax in the amount of $13,908 for the 1995 tax year and interest in the amount of $2,121.67. Laird testified that his manager approved the agreement but was not required to sign off on it because it was a consent agreement. The Examination Report assessing the additional 1995 tax was reviewed and accepted by District Director, K.J. Sawyer. Plaintiff and his wife then executed an Installment Agreement to pay the total amount of $16,029.67 with an initial payment of $6,029.67 and installments of $278 per month until the balance was paid in full.

6

The Plaintiff and his wife's acceptance of the settlement agreement was based entirely upon their understanding that they were entering into an agreement and settlement of all tax matters with the IRS in connection with Plaintiff's ownership interest in Caxton.  Hardin testified that this was also his understanding, and that he had informed the Plaintiff and his wife that the agreement covered both the 1982 and the 1995 tax years.  Mrs. Seay testified that upon making the last installment payment on May 27, 1998, she specifically asked Laird whether the agreement covered both 1982 and 1995, and Laird confirmed that it did.  Laird testified that he could not specifically remember telling the Seays that the 1982 tax was settled (and believed that he would <u>not</u> have told them that because he was not auditing 1982 and no 1982 assessment had been made at that time), but agreed that it was possible that he thought the 1982 tax year was closed (that is, that the statute of limitations had run for the 1982 tax year).  Notes from Teddy Skokos, Jr., counsel for the Seays following the 1982 assessment, indicate that Laird told Skokos that he believed the 1982 tax year was closed.

After Plaintiff and Mrs. Seay completed payments under the installment agreement, they had no further communication from the IRS pertaining to Caxton or their 1982 return until the 1982 examination report and assessment was issued to them in 1999 following the conclusion of the Tax Court Litigation.  The Tax Court entered a decision against Caxton and in favor of the IRS on January 5, 1999, following an Order to Show Cause procedure whereby Caxton had the opportunity to prove that its case should be resolved differently from *Krause*, one of the test cases.    On November 24, 1999, the Plaintiff received an Explanation of Income Tax Examination Changes showing that he owed $37,280 in

7

additional taxes with interest of $205,459 for a total of $242,739 as a result of the disallowance of the 1982 loss deduction.   On February 21, 2000, Plaintiff received another IRS notice informing him that he owed $246,445.07 for the 1982 tax period.

After receiving the 1982 assessment in 1999, Hardin attempted to resolve the matter with the IRS.  An IRS memo introduced into evidence indicates that Hardin called an IRS employee in February of 1999, and explained that the taxpayers had already entered into an agreement with Laird, and that "the 1982 tax year was carried to the 1995 tax year and that was when it was recognized."   This evidence corroborates Hardin's testimony that he understood the IRS was choosing to recognize the previously untaxed income upon the partnership's termination in the 1995 tax year rather than the 1982 tax year.  Hardin testified that during his discussions with the IRS in 1999, the IRS did not agree that the 1995 assessment settled or otherwise precluded the 1982 assessment.  Plaintiff then hired Skokos who wrote letters and made phone calls to the IRS, with no resolution.  An e-mail from Skokos to Mrs. Seay dated August 1, 2000, reports that Skokos had a conversation with Laird who informed him that the IRS had handled all Arkansas residents who were partners in Caxton in the same manner, and that the IRS had "subsequently determined that the method of settlement employed in 1995 for all Arkansas residents was incorrect."  Skokos testified that this e-mail accurately summarized his understanding of what happened and why the Plaintiff was assessed a 1982 tax after having been assessed an inconsistent 1995 tax.  When asked about Laird's conversation with Skokos as reflected in the e-mail, Laird denied having ever said anything about 1982 or that the government had changed its mind after originally

intending to deal with these partnerships by taxing the partners on their negative capital accounts in 1995. Skokos' notes also indicated that an IRS appeals officer, Judy Helm, had told him that she had heard rumors about IRS agents settling 1982 issues in the 1995 tax year. It was also Skokos' understanding that the $16,029.67 paid by Plaintiff in 1997 and 1998 would be credited to the 1982 assessment although it is undisputed that it never has been. In October 2000, Skokos then filed a claim for abatement on behalf of the Plaintiff which was eventually denied by the IRS. (By this time, the two-year statute of limitations had run so that Plaintiff could not file a claim for refund for the 1995 taxes paid from 1997 through May of 1998.)

After filing an unsuccessful claim for abatement through Skokos, Plaintiff was referred to his current counsel who filed an Offer In Compromise based on doubt as to liability in 2002 in a further attempt to settle the 1982 assessment. The IRS did not accept the Plaintiff's Offer in Compromise, and Plaintiff appealed that decision. The appeal was denied more than two years later in March of 2005. Plaintiff and his wife then filed bankruptcy on July 27, 2005.

Plaintiff testified that after the 1984 audit, he received many notices regarding the pending litigation, and although he did not understand exactly what was going on, he knew he would owe some money at some point. He and his wife therefore delayed having children and buying a larger home. Plaintiff testified that he has spent over $10,000 in legal fees and the uncertainty over the taxes owed had put a strain on his marriage and family. After reaching an agreement regarding the 1995 assessment, Plaintiff and his wife believed that

9

they had settled all their tax issues, and began a family.  They had one child, purchased a larger home and vehicle, and started a college fund for their son.  After receiving the 1982 assessment, the Plaintiff and Mrs. Seay changed their lives again by putting off having more children and saving as much money as they could for any potential tax liability and for attorneys fees.

## ANALYSIS

### I.    <u>Jurisdiction</u>.

Pursuant to 11 U.S.C. § 505(a)(1), the bankruptcy court has jurisdiction

> . . . to determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and  adjudicated by a judicial or administrative tribunal of competent jurisdiction.

However, subject to § 505(a)(2), which incorporates traditional principals of *res judicata*, the bankruptcy court does not have jurisdiction to determine the amount or legality of taxes that have already been contested and adjudicated in a judicial or administrative proceeding before the commencement of the bankruptcy case.  In this case, the Tax Court Litigation adjudicated the proper treatment of certain partnership items of Caxton, and did not adjudicate the tax liability of the individual partners such as Plaintiff.  In fact, the Plaintiff could not challenge the 1982 assessment in Tax Court because it did not have jurisdiction.  The Tax Court has held, "[w]e have no authority under section 6226(f) to determine any affected item or the tax liability of any partner." *Crop Associates-1986 v. Commissioner,* T.C. Memo 2000-216, *9 (Tax Court 2000).  Notwithstanding the Court's jurisdiction under § 505(a), the IRS asserts

10

that this Court does not have jurisdiction to determine an equitable issue if there was no settlement agreement between the Plaintiff and IRS regarding the 1982 tax liability. However, the IRS cites no authority for this proposition, and the Court finds it is contrary to existing case law.  *See e.g., Kreidle v. Department of the Treasury (In re Kreidle)*, 143 B.R. 941 (D.Colo. 1992) (affirmed Bankruptcy Court's ruling that equitable estoppel prevented government from assessing additional taxes and finding jurisdiction proper with no distinguishment made on the grounds that the Bankruptcy Court ruled on equitable estoppel); *Dycoal, Inc. v. Internal Revenue Service (In re Dycoal, Inc.)*, 2006 WL 360642 (W.D. Pa. 2006) (finding court had jurisdiction over equitable estoppel claim).

The IRS further argues that this Court lacks jurisdiction over the Plaintiff's claim for a refund and claim for abatement of taxes and interest under the anti-declaratory relief statute, 28 U.S.C. § 2201, and the anti-injunction statute, 26 U.S.C. § 7421.  The anti-declaratory relief statute has been specifically amended to exclude determinations of tax liability under 11 U.S.C. § 505 from its reach.  *See generally, In re UAL Corp.*, 336 B.R. 370 (Bankr. N.D. Ill. 2006).  Because this is a proceeding under § 505, the anti-declaratory relief statute is inapplicable.   Likewise, the Supreme Court has held that where a party has no adequate remedy at law and therefore is entitled to equitable relief, the anti-injunction statute will not prevent the party from seeking injunctive relief against the government.  *See South Carolina v. Regan,* 465 U.S. 367, 104 S.Ct. 1107 (1984); *Dore & Associates Contracting, Inc., v. United States (In re Dore & Associates Contracting, Inc.)*, 45 B.R. 758, 762 (Bankr. Mich. 1985).  In *Dore*, the court stated,

11

> In short, the *South Carolina v. Regan* decision can be regarded as holding that
> the scope of the Anti-Injunction Act was intended to parallel that of the
> familiar maxim of equity jurisprudence that one must show the unavailability
> of any remedies at law before one may petition for equitable relief. The Act
> prohibits courts from exercising their equitable power to enjoin whenever the
> taxpayer may utilize other remedies such as refund suits; at the same time, it
> does not prevent injured parties from seeking equitable relief in appropriate
> situations, nor does it withdraw from courts the jurisdiction to provide that
> relief when justice so requires.

Accordingly, to the extent Plaintiff's request for refunds constitutes injunctive relief, the anti-injunction statute does not bar this Court from determining that Plaintiff is entitled to such refund.

## II.     Settlement of the 1982 Loss Deduction.

It is the Plaintiff's contention that a settlement of 1982 partnership items occurred in connection with the examination of his 1995 return and that this settlement invalidated the 1982 tax that was subsequently assessed.  Because the Court finds that the IRS is estopped from assessing the 1982 tax liability under principles of equitable estoppel, as explained below, it is unnecessary to determine whether there was an express or implied settlement under either applicable tax law or general contract law, or whether the 1995 assessment precluded the 1982 assessment as a matter of law by converting the deductions generated by the partnership (partnership items) in 1982 and the Plaintiff's basis in his partnership interest (an affected partnership item) to non partnership items.

## III.    Estoppel.

To establish a claim for equitable estoppel against the government, the claimant must prove (1) false representation by the government; (2) that the government intended to induce

the claimant to act on that representation; (3) the claimant's lack of knowledge or inability to obtain the true facts; (4) that the claimant relied on the misrepresentation to his detriment; and (5) affirmative misconduct by the government. *Castillo v. Ridge*, 445 F.3d 1057 (8th Cir. 2006). As explained below, the evidence adduced at trial established each of the elements of equitable estoppel, such that the 1982 assessment is invalid and Plaintiff is entitled to a return of previously withheld income tax refunds.

### A. *False Representation by the Government*.

The 1995 examination, in and of itself, misrepresented the IRS's position, in that the 1995 liability was based on the validity of the 1982 loss. According to the IRS's theory of the case, it chose to violate its own policies and the express provisions of the Internal Revenue Code by assessing tax on an affected partnership item prior to the conclusion of the Tax Court Litigation, knowing that the 1982 loss had already been denied by the Courts. Without the loss claimed on Plaintiff's 1982 return, there would have been no "negative basis" and no gain in 1995 to warrant the increased tax for 1995 and, in fact, Plaintiff would have been entitled to claim a capital loss on his 1995 return. The tax for the 1995 and 1982 years are mutually exclusive. Either the 1982 Caxton losses deducted by the Plaintiff are invalid, in which case there would be a large tax due for 1982 but none due for 1995, or the losses claimed for 1982 were valid, and a much lesser tax would be imposed upon the termination of the Caxton partnership in 1995.

Hardin testified that he understood that in computing the tax for 1995, no tax would be asserted for 1982, and that this was the method the IRS had chosen to settle the Plaintiff's

entire tax liability as a result of his investment in Caxton. This was also the Plaintiff and Mrs. Seay's recollection. Later, Skokos came to the conclusion (based in part on a conversation with Laird) that the IRS settled all the Arkansas Caxton partners by taxing their negative capital accounts in 1995 and later determined that this was incorrect and made additional assessments. Laird contends he remembers no discussions to this effect, either with the Seays, Hardin or Skokos, and did not understand that assessing the 1995 tax affected the 1982 tax. The exclusivity of these two options was clear to Plaintiff's counsel and should have been clear to Laird – if Laird was mistaken, one of his superiors should have caught it, particularly in light of the fact that all the relevant information about the ongoing Tax Court Litigation was contained in the Examination Report which triggered the 1995 audit. The Court does not find credible Laird's testimony that he did not understand the exclusivity of these two options, or that he did not discuss these matters with Plaintiff's counsel. Based on all the circumstances and the evidence presented, the Court finds that all parties involved understood that the tax would be assessed in 1995 <u>instead of</u> 1982. The IRS's role in creating this understanding constitutes a false representation.

### B.   *Inducement to Act*.

The 1995 examination induced Plaintiff to pay his 1995 liability, which he would not have otherwise agreed to pay. The Plaintiff accepted, without objection, the resolution to the matter proffered by the IRS in 1995. The resolution was payment in full of the 1995 tax that would not have otherwise been due but for the losses claimed in 1982 that the IRS knew had already been denied as a result of the Tax Court Litigation (via the Examination Report).

14

Again, the IRS's actions caused Plaintiff to believe that he was being taxed in 1995 in lieu of assessing additional tax for 1982. It is incredulous that Plaintiff would agree to pay a tax for 1995 if he were still liable for a loss taken in 1982 when he could not legally be taxed for both. The Court finds the IRS induced Plaintiff to pay a tax in 1995 by leading him to believe he would not be liable for additional tax for the 1982 tax year.

### C.    *Lack of Knowledge*.

Plaintiff and his legal counsel were ignorant of the error of fact because they believed it to be true that any potential 1982 liability was settled by reason of the 1995 examination changes. The Plaintiff, in fact, had no way of knowing the Defendant's true intentions, if those intentions were to double-tax the Plaintiff, as the Defendant now contends. At trial, the IRS argued that it was incredulous that the IRS could have agreed to settle the 1982 tax year which ultimately resulted in $246,445.07 in additional liability as of February 21, 2000, for a mere $16,029.67. Again, the Court finds it much more unbelievable that a taxpayer would agree to pay over $16,029.67 knowing that he might be subject to additional taxes based on an inconsistent treatment of the very item that the $16,029.67 liability was based on! The Plaintiff was not privy to information that would allow him to determine whether the 1995 audit was conducted due to error, or because of some perceived risk of proceeding at the partnership level, or to conclude the matter at the earliest possible date. Regardless of the reason, the examination of Plaintiff's 1995 return was instigated by the IRS, and the information on the Examination Report included the information regarding the disputed 1982 loss and resulting litigation, and therefore, Plaintiff had every reason to believe the IRS knew

15

what it was doing.

### D.    *Reliance and Detriment*.

Because the computation of the 1995 tax liability was based upon the validity of the1982 loss, the Plaintiff reasonably relied on the fact that the 1995 tax liability precluded a 1982 tax liability, as explained above.  The detriment  to the Plaintiff occurred in several forms.  He lost time and money in the process of dealing with the 1995 audit, producing records and hiring an attorney.  He lost additional time and money dealing with the subsequent 1982 assessment and in ascertaining the IRS's changed position.  He paid the1995 liability when those funds could otherwise have been used for a myriad of purposes, including to contest or compromise the 1982 liability.  In fact, by the time the 1982 assessment was made, the two-year statute of limitations in which the Plaintiff could have filed a claim for refund had passed for the portion of the 1995 tax paid in 1997.  From these facts, it is evident that the inducement to enter into a settlement agreement and to pay the 1995 taxes, by its nature, misled the Plaintiff to his detriment.  The Plaintiff and his spouse made changes to their lifestyle subsequent to what they believed to be a settlement of their entire Caxton tax liability.  They had a child and purchased a larger home to accommodate their family, both of which they had postponed for many years due to their uncertain financial situation caused by the 1982 examination.  The Plaintiff was entitled to rely on the IRS's actions.  The computational adjustment on the 1982 return was not issued until two years after the 1995 audit was complete.  After receiving the 1982 assessment in 1999, Plaintiff changed his lifestyle once again, by saving money and choosing not to have any

16

more children.  In summary, the Plaintiff justifiably and reasonably relied upon the IRS's agreement and settlement of the 1995 tax year as a resolution of all tax issues in connection with their ownership interest in Caxton.

### E.    *Affirmative Misconduct*.

In the Eighth Circuit, affirmative misconduct is required to enforce equitable estoppel against the government.  *Castillo v. Ridge, supra*.  Affirmative misconduct is defined by the courts as misconduct "that was designed to mislead or was unmistakably likely to mislead a plaintiff."  *Garfield v. J.C. Nichols Real Estate*, 57 F.3d 662, 666 (8th Cir. 1995).  Courts have held that intentional misrepresentation or concealment is not necessary to a finding of affirmative misconduct, and that affirmative misconduct can be present when the IRS merely gives incorrect information.  *Kriedel v. Department of Treasury, Internal Revenue Service*, 146 B.R. 464 (D. Colo. 1991) (citing *Tosco Corp. v. Hodel*, 611 F. Supp. 1130 (D. Colo. 1985)).

The IRS' conduct in making the 1995 assessment – from the issuance of the Examination Report to the approval of the assessment itself – was unmistakably likely to mislead the Plaintiff.  The IRS made a deliberate decision to treat the Caxton partnership as a "burned out" tax shelter partnership, *i.e.*, a partnership which has been allowed tax deductions for nonrecourse liabilities that have not actually been paid.  The IRS then issued the Examination Report which instructed the auditor to audit the Plaintiff's 1995 return for the purpose of taxing the Plaintiff on the inherent gain on the deemed disposition of the partnership in its final year, 1995.  If the directive were meant to instruct the auditor to audit

17

only those years that were not the subject of the Tax Court Litigation, then that exclusion should have been stated. Both the Plaintiff's legal counsel and Laird were provided with the directive and understood that the IRS sought to tax the partners upon the partnership's dissolution – both assumed that meant the 1982 loss deduction (the only one taken by Plaintiff) would be taken into account in computing the tax due. The IRS' decision to tax the Caxton partners upon the partnership's dissolution was made even though the Tax Court and Appeals Court had denied the partnership's deductions for certain loss years, including 1982, and this fact was explicitly stated on the Examination Report that precipitated the examination of the Plaintiffs' return. Under these circumstances, it is implausible that the IRS overlooked the fact that Caxton was then subject to a TEFRA examination. The 1995 examination was approved by Laird's manager and the District Director. The IRS now admits that through Laird and the Little Rock examination office, it made a mistake in assessing the 1995 tax – the IRS claims Laird lacked the authority to make any decisions with respect to the Plaintiff's 1982 tax return or the loss deductions which were at issue in the Tax Court Litigation. However, the IRS cannot rely on Laird's lack of authority to settle the 1982 tax issues involved in the Tax Court Litigation because Laird's authority or lack thereof over the issues involved in the Tax Court Litigation is not at issue – the IRS' conduct in allowing such a mistake to occur is.[3]  In short, the IRS must be held accountable for the

---

[3]In examining a similar argument by the IRS regarding whether an agent had authority, the court in *Tonkonogy v. U.S.* stated:

> ". . . some forms of erroneous advice are so closely connected to the basic fairness of the administrative decision making process that the government may be

actions of its agents and examination offices and the directions it provides its agents and examination offices, and in this case, the IRS created a situation that would necessarily lead the Plaintiff to believe that the IRS was choosing to tax him in 1995 instead of 1982.  The IRS's actions in instigating the 1995 assessment and allowing it to take place despite the ongoing Tax Court Litigation constitutes affirmative misconduct.

## IV.    Attorney's Fees.

Under the so-called "American Rule," parties to litigation normally bear the cost of their own attorney's fees.  *See Seimer v. Nangle (In re Nangle)*, 2002 WL 1869606 (8th Cir. B.A.P. 2002).  "Under this 'American Rule' it is improper to award attorney's fees incurred in litigation unless the right to such fees is set by statute or awarded by contract."  *Id.* Plaintiff requests an award reimbursing him for his administrative and litigation costs, including attorneys fees, pursuant to 26 U.S.C. § 7430, and any other applicable statute.  The Court is aware of no other applicable statute, and while the Court is inclined to award Plaintiff his costs in connection with this matter, the Court must determine that the Plaintiff is entitled to such an award under the provisions of § 7430.  Accordingly, the Plaintiff has thirty days from the date of this Memorandum Opinion and the Judgment entered in this case to file the required application under § 7430(c)(4) cross-referencing the first sentence of 28

---

estopped from disavowing the misstatement."  Thus, by analogy, an IRS agent may not have the actual authority to bind the government; yet as to a taxpayer who relies upon his statements to his detriment at a time of great personal trauma and concern, that agent will be found to be acting within the apparent scope of his authority. Anything to the contrary would, in my opinion, be ". . . hardly worthy of our great government."
417 F.Supp. 78 (S.D.N.Y. 1976) (quoting *Brandt v. Hickel*, 427 F.2d 53, 56-57 (9th Cir. 1970)).

U.S.C. § 2412(d)(1)(B), which provides:

> A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed.

The IRS will have thirty days from the date of the application to file its response, and the Court will then enter an Order regarding whether the Plaintiff is entitled to an award of fees and costs in connection with this matter under § 7430.

## CONCLUSION

It is inequitable for the IRS to resolve the Plaintiff's Caxton tax liability by the assessment of a 1995 tax based on the allowance of a loss taken in 1982, receive payment in full satisfaction thereof, and then to ignore its actions and proceed to assess a 1982 tax liability based on the disallowance of the same loss. The elements of equitable estoppel have been proven, and the 1982 assessment is hereby held invalid, and the IRS is hereby directed to refund Plaintiff's bankruptcy estate $6,928 in previously withheld tax refunds with interest at the applicable federal short term rate plus 3% for the periods in which the IRS withheld Plaintiff's income tax refunds; such interest shall be compounded annually from the dates that the IRS applied the refunds to the Plaintiff's 1982 assessment.[4] Further, the Plaintiff has

---

[4]"Income tax refunds received by a Chapter 7 debtor after filing for bankruptcy have been held to constitute estate property and not postpetition income which is excluded from property of the estate. Thus, the debtor may be required to surrender such a refund to the trustee, including interest, at least where the refund relates to prepetition earnings. Similarly, income taxes

20

thirty days from the date of this Memorandum Opinion and the Judgment entered in this case to file the required application under § 7430(c)(4).

**A judgment in accordance with this Memorandum Opinion will be entered this date.**

_____

HONORABLE AUDREY R. EVANS
UNITED STATES BANKRUPTCY JUDGE

DATE:___October 30, 2006_____

cc:     Neil Deininger and Reba Wingfield, attorneys for Plaintiff/Debtor
        Gerald Leedom, attorney for the United States
        Richard Cox, Chapter 7 Trustee
        U.S. Trustee

---

withheld from a debtor before the filing of the debtor's bankruptcy petition are subject to turnover to the estate."  9A Am. Jur. 2D Bankruptcy § 1603.

21